## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| In Re: | Bankruptcy No. 17-30061 |
| McM, Inc., | Chapter 7 |
| Debtor. | |

Erik A. Ahlgren, Trustee,

        Plaintiff,

      vs.                              Adversary No. 18-07056

Kenneth H. Johnson,

        Defendant,

Kenneth H. Johnson,

        Counter-Claimant,

      vs.

Erik A. Ahlgren, Trustee,

        Counter-Defendant.

_____/

### MEMORANDUM AND ORDER

Plaintiff Erik A. Ahlgren, Trustee, filed a Complaint on November 20, 2018, alleging Debtor McM, Inc. transferred over $900,000 in prepetition lease payments to Defendant Kenneth H. Johnson during the year before it petitioned for bankruptcy relief.  Doc. 1.  The Trustee claims Johnson is an insider and seeks to avoid most of these lease payments as preferential transfers under 11 U.S.C. § 547 of the

Bankruptcy Code.[1]  On December 20, 2018, Johnson filed an Answer denying the

Trustee's allegations and seeking dismissal of the Complaint.[2]  Doc. 5.  The Court tried

the case on August 3, 2020.

## I.    FINDINGS OF FACT

### A.    Background

Prior to petitioning for bankruptcy relief, Debtor was a corporate farming

entity that leased real property and produced crops.  Debtor's farming operation

included farms in St. Thomas, Grand Forks and Fargo, North Dakota.  Its office

was located in St. Thomas, North Dakota.  At all relevant times, Ron McMartin, Jr.,

was Debtor's president.  Melissa Gauthier served as Debtor's office manager.

Debtor also employed agronomists, farm managers and other employees.

Debtor leased several parcels of real property, comprising approximately 10,000

of the acres it farmed, from Johnson.  McMartin and Johnson negotiated the land

leases.  According to both McMartin and Johnson, Debtor paid the full market rate for

land rent at the time they negotiated the leases.

Gauthier described Johnson's relationship with Debtor as the same as Debtor's

relationship with all other landowners.[3]  Gauthier rarely communicated with Johnson's

---

[1] The Trustee also pled several other causes of action in his Complaint, but he withdrew them prior to trial. Doc. 53.

[2] In his Answer, Johnson alleged a Counterclaim, seeking to recover funds from the bankruptcy estate.  Doc. 5.  Johnson withdrew his Counterclaim prior to trial.  Doc. 53.

[3] All Debtor's land leases with landowners were in writing except one modification to a lease with Johnson.  Debtor farmed a parcel of Johnson's land near Devils Lake. Debtor and Johnson entered a three-year lease of this parcel for the years 2014-2016.

office manager, Kim Johnson, who is Johnson's sister. Gauthier never saw Johnson in or outside Debtor's office. According to Johnson, McMartin and Johnson rarely spoke. When they spoke, their conversations were brief and related only to their land lease agreements. McMartin testified that he did not see or speak to Johnson in 2016.

As of April 8, 2016, Debtor owed Johnson $1,810,617.50 for 2016 past due land rent. Doc. 53. On that date, Kim Johnson sent Gauthier an email listing the balances due and inquiring about payment. Ex. T-2.

Debtor issued the following checks to Johnson:

| Date | Payment |
|------|---------|
| 4/25/16 | $100,000 |
| 5/02/16 | $252,425 |
| 5/09/16 | $200,000 |
| 5/23/16 | $45,000 |
| 6/17/16 | $500,000 |
| **Total:** | **$1,097,425** |

Id. Johnson claims that the balance of the 2016 rent Debtor owes him is $356,542.50.

Id. Prior to trial, the parties agreed to treat the $356,542.50 in 2016 land rent as "new value" and reduce the sum of the alleged preferential transfers based on this defense.

Id. Accordingly, the parties agree that $740,882.50 is the sum at issue in this preferential transfer action. Id.

---

Debtor paid Johnson $200/acre the first year of the lease. After the first year, McMartin (on behalf of Debtor) proposed amending their agreement to reduce the lease rate and to add a crop share provision for the second year. McMartin also proposed that they modify the third year of the agreement to provide that Johnson would be paid with a share of the crop Debtor raised, but he would receive no rent payment. McMartin suggested the modified terms because of the likelihood that flooding would render a portion of land unfarmable. Johnson and Debtor reached an oral agreement regarding this modification.

In 2016, before and after the payments to Johnson, Debtor experienced cash flow problems. For the three-month period ending March 31, 2016, Debtor's retained earnings deficit totaled $916,280. Ex. T-1. Many of Debtor's land lease payments were due in April 2016, and several of Debtor's suppliers sought payment at that time. Debtor fell behind on its bills. According to Gauthier, Debtor's plan was to pay small local suppliers first to the extent it could.

In addition to small local suppliers, Debtor also prioritized land lease payments, but Gauthier testified that Debtor did not prioritize Johnson over any other landowner. In April 2016, Johnson noticed that Debtor's rent payments were late, but he testified that he had no idea Debtor's business was failing. Johnson claimed he was not aware that Debtor paid him while failing to pay other creditors during the same time frame.

Johnson was not a partner or director of Debtor. Johnson did not control Debtor's corporate policies. Johnson did not have access to Debtor's financial information, and he did not have authority to pay Debtor's obligations or to contract on Debtor's behalf. There is no evidence suggesting Johnson exercised control over Debtor. There is no evidence that Debtor operated Johnson's business under a lease or operating agreement or that substantially all of Johnson's property was operated under an agreement with Debtor. According to both Johnson and McMartin, Johnson's only relationship with Debtor was that of a landowner lessor.

B.    Debtor's Management Team and Office Staff

In addition to reviewing Debtor's relationship to Johnson, analysis of the roles and responsibilities of Debtor's management team and office staff is necessary to determine whether Johnson was an insider of Debtor as the Trustee alleges. Debtor's

4

management team included McMartin; St. Thomas farm manager, Eric Eischens; Grand

Forks farm manager, Kyle Zak; Fargo farm manager, Larry McMartin; agronomists,

Zack Bruer and Shawn Lyberg; and potato production manager, Michael Hilde.  Ex. T-

12.  Except for McMartin, none of the members of the management team were

corporate officers.

In planning for the farming season, McMartin apprised the team about land

Debtor leased,[4] and the team collaboratively generated a plan for Debtor's farming

operation.  The plan included, for example, the number of acres Debtor would plant of

each crop.  Each team member made recommendations to the team which, in turn,

made recommendations to McMartin.  Although the team developed and recommended

a plan and offered their advice, McMartin made all final decisions, and he ultimately

determined the plan.[5]  The management team executed the plan McMartin approved.

As Zak explained, the team was included in the conversation but not the decisions.

The management team met approximately monthly, but they stayed in close

communication between meetings and constant contact during busy times.  The team

discussed the progress of the growing season and ongoing needs related to seed, fuel,

inputs, equipment and labor.

In consultation with the rest of the team, the agronomists decided what crops

Debtor planted in the various fields and when Debtor planted them.  The agronomists

---

[4] McMartin did not disclose financial details like the price Debtor paid per acre for land.

[5] McMartin also contracted with suppliers, marketed crops and submitted crop insurance paperwork.

and McMartin ordered seed and fertilizer.  The agronomists inspected the fields and advised the farm managers when to spray the fields.  The agronomists also scheduled the tasks to be completed on the fields and relied on the farm managers to direct the use of equipment and labor necessary to complete the work.

The farm managers assumed responsibility for Debtor's day-to-day operations. In addition to selecting which equipment to use and directing labor on the fields, the managers directed the work of the other farm employees such as equipment operators and drivers.  The farm managers also directed the farm employees they supervised to work at other farms when necessary.  The managers decided when to harvest crops and informed the drivers whose name should be listed on the scale tickets.

McMartin granted the managers considerable latitude to make decisions regarding daily operations, but he did not give them complete discretion.  As an example of the delineation of duties, the managers directed workers to pick up seed and fertilizer as Debtor needed them, but the managers did not order these supplies.  Farm managers ordered fuel and equipment parts and arranged for equipment repairs, but they did not pay for these supplies and services.  Although neither Debtor nor McMartin explicitly limited the managers' authority to purchases under a certain sum, the managers looked to McMartin for authority for "major" purchases or expenditures.  As an example, managers would not purchase a tractor without McMartin's authority, but they may order tires for a tractor.  McMartin relied on the managers to tell him when they needed new equipment, and he purchased the equipment for Debtor.

Debtor provided the managers credit cards in Debtor's name, but the farm managers did not have authority to pay Debtor's obligations.  Instead, Debtor's office

6

staff processed all of Debtor's bills and payments. Debtor did not grant the managers access to Debtor's financial information.

Although the managers approved the hours of those they supervised, Debtor's office staff issued employee paychecks. Similarly, Debtor did not grant farm managers unfettered authority to hire and fire employees. Debtor's office staff advertised and solicited applications for employees in the spring, fall and any other time the farm managers needed more workers. The office staff advertised for these positions based on input from the managers regarding their labor needs. For example, if a farm manager needed a driver, the manager informed Debtor's office, and the office staff advertised for a driver. The farm managers also identified prospective employees. Prospective employees submitted applications to Debtor's office, Debtor's office staff vetted the applicants, and the farm manager interviewed the applicants forwarded to him by Debtor's office. The manager then administered any applicable practical tests (e.g., driving tests) to ensure potential new employees possessed the necessary competencies. Consistent with this process, Hilde understood that farm managers could hire employees from a list of names preapproved by Debtor. Likewise, Zak testified that all hiring and firing decisions "went through HR." [6]

---

[6] Austin Young suggested Zak exercised unlimited authority to hire him as a farm employee. Young worked for Debtor in the summer and fall of 2015 and 2016. According to Young, he interviewed with Zak, who hired Young "on the spot." Zak was unable to recall the details of Young's hiring, but he acknowledged that he was able to hire directly for fall harvest. According to McMartin, if Young passed Zak's competency test, Young's name would have been forwarded to Debtor's office, and the office staff completed the tasks necessary to formally hire Young.

C.    Kyle Zak

The Trustee alleges Zak is a "managing agent" or "person in control" of the

Debtor.  Accordingly, Zak's role as Debtor's Grand Forks farm manager is at issue.

Zak is Johnson's nephew.  In 2010, Johnson told Zak that Debtor would be

leasing Johnson's land, and Zak contacted McMartin to inquire about a position with

Debtor.  Johnson did not contact McMartin about hiring Zak.

McMartin was familiar with Zak because Zak farmed Johnson's land for Johnson.

McMartin interviewed Zak and hired him as an equipment operator.  Zak operated

equipment for a year before assuming the role of manager of Debtor's Larimore farm.

Zak became Debtor's Grand Forks farm manager in 2011.

As the farm manager, Zak ran the day-to-day operations of the Grand Forks farm

under McMartin's direction.  Zak's responsibilities included carrying out the

management team's plan, coordinating logistics and directing daily work.   McMartin

characterized Zak as the "leader of the labor force" for the Grand Forks farm.  The

Grand Forks farm employed approximately 25-30 workers—four or five worked all year,

and the other employees worked during the farming season.  Each day, Zak assigned

the employees specific duties for the day and communicated with them through radios

throughout the day.[7]

Debtor did not authorize Zak to issue checks on Debtor's behalf, but it granted

him limited authority to incur charges through his company credit card.  Like the other

farm managers, Zak's authority to obligate Debtor was not limited to a precise sum, but

_____

[7] Zak also handled personnel issues.  For example, an employee injured his foot
on the job and needed medical attention.  Zak visited the employee at the hospital and
told him to submit worker's compensation paperwork.

8

McMartin testified that Zak, like other farm managers, was "never really encouraged to spend in excess of $1000 unless they had permission."  Although Zak ordered equipment repairs and bought parts on behalf of Debtor, Zak talked to McMartin multiple times every day and informed McMartin about expenditures.  If Zak decided the Grand Forks farming operation required new equipment, he explained the need to McMartin. When Zak received invoices, he reviewed them and sent them to Debtor's office for payment.  He had no authority to pay invoices on Debtor's behalf.  He did not have signatory authority on any of Debtor's accounts.  Zak did not dictate which bills Debtor paid or when Debtor paid them.  He had no authority to spend Debtor's money on his personal expenses.

Zak did not sell Debtor's crops, and he did not have the authority to enter contracts on Debtor's behalf.  He was not involved in collecting payment for crops. Although he ensured that the crops were accurately listed in crop insurance paperwork, he did not sign crop insurance forms.[8]

Zak was not involved in Debtor's financing, and McMartin did not discuss farm finances with Zak.  Zak did not know Debtor's credit or finance terms.  He did not have access to Debtor's financial documents, and he never read any of Debtor's financial statements.  Zak did not control Debtor's policies.

Although Zak was generally aware of Debtor's land rent costs, he never saw a list of the land rent prices Debtor paid for the land it farmed, and he did not know how

_____

[8] According to McMartin, Zak's role with regard to crop insurance was "information gathering."  McMartin asked Zak to fill in the crops and planting dates on aerial photos McMartin submitted to the Farm Service Agency.

much Debtor paid for each piece of land it farmed.[9]  Zak had no input on the price

Debtor paid for land rent.

By 2016, Zak knew Debtor was struggling financially.  Some of Debtor's suppliers

stopped allowing Debtor to charge on account.  Zak informed McMartin regarding the

refusals, and McMartin told Zak to use his farm credit card to pay for supplies.

McMartin did not share any details of Debtor's financial trouble with Zak.  As the farming

operation evolved, Zak helped McMartin identify equipment Debtor no longer needed,

but he did not sell or dispose of any of Debtor's assets.

Zak neither negotiated the land leases between Johnson and Debtor nor asked

Debtor to pay Johnson instead of other creditors.  Zak was not even aware that land

lease payments to Johnson remained unpaid.  Johnson never asked Zak to "bring

something to a management meeting," and Zak never discussed Debtor with Johnson.

Zak never asked Gauthier to pay Johnson or any creditor.

Johnson maintained that he never asked Zak to influence Debtor.  Specifically,

he testified: "I had no business with McM inside McM's walls.  None.  I had no

comments on it, I knew nothing about it, I had no business inside McM.  No dialogue.

No nothing.  The only business I had with McM was outside McM as a landowner

leasing land.  Period."  In December 2016, when Debtor defaulted on the land leases

with Johnson, Zak did not discuss the defaults with Johnson.

---

[9] Zak did not know the cost Debtor paid per acre for farmland, but he "had an
idea" of the cost per acre to grow certain crops.

D.      McM Restructuring Possibilities and Bankruptcy

In late January 2017, a representative of Kinetic Leasing emailed McMartin about past-due payments on equipment Debtor leased.  Ex. T-5.  McMartin told the Kinetic representative that Johnson was his new farm partner.  Id.  At trial, McMartin explained that he was pondering a partnership with Johnson at the time but had not discussed— and never discussed—the possibility with Johnson.  Although he hoped to partner with Johnson at the time he made the representation, McMartin acknowledged that he was trying to keep the Kinetic representative "holding on."  McMartin wanted to keep the farm intact and tried to ideate a way to do so.  Johnson testified that he never intended to partner with Debtor.

Debtor petitioned for bankruptcy relief on February 10, 2017. According to McMartin, no one knew about the bankruptcy until Debtor filed the petition.

E.      Kenneth Johnson and Elkhorn Farms

By early 2017, Johnson had heard rumors about Debtor's financial troubles. Although the farming community is small and Debtor was behind on its rent to Johnson, Johnson did not hear directly from McMartin.  Johnson testified that he "had an idea I was getting my land back,"[10] and started working on forming a business entity to farm the land if it became necessary.

In February 2017, Johnson contacted Brian Johnson,[11] Chief Executive Officer of

---

[10]  Johnson claimed he did not know he was "getting his land back" until Debtor filed its bankruptcy petition.

[11] Brian Johnson is Johnson's cousin and had been Johnson's banker for 20 years.

Choice Financial, to discuss his options in the event that Debtor would no longer be farming Johnson's land.  In consultation with Brian Johnson, Johnson decided that he and his cousin, Al Johnson, would form Elkhorn to farm the land.  Johnson and Al Johnson filed the paperwork to register Elkhorn as a limited liability company with the North Dakota Secretary of State on February 23, 2017.  See Ex. T-19.

Although Johnson owned farmland in a number of states, he was not an experienced farmer.  Brian Johnson, who had relationships with other businesses in the local agricultural industry, helped Johnson acquire equipment, allowing Elkhorn to plant crops that spring.  Specifically, Brian Johnson worked with John Deere and Kinetic Leasing to equip Elkhorn to farm thousands of acres of land on very short notice.  Brian Johnson considered his involvement to be helpful to all the entities involved, not just Johnson.

Brian Johnson and his staff assembled the necessary financial packages for Elkhorn.  According to Brian Johnson, Johnson had almost no direct contact with Kinetic Leasing aside from signing promissory notes.

Zak worked for Debtor until Debtor petitioned for bankruptcy relief.  After Debtor petitioned, Elkhorn hired Zak as a farm manager.[12]  According to Johnson, Zak worked with Choice Financial to develop a budget for Elkhorn because Johnson "didn't know what they'd need."

McMartin also worked for Elkhorn for a short period of time in March and April

---

[12] Zak testified that, before he began working for Elkhorn, Zak only spoke to Johnson at family holidays.

2017.[13]  McMartin assisted Elkhorn with the logistics of farming.  After Debtor filed for

bankruptcy relief, McMartin contacted landowners from whom Debtor had leased land

and referred these "panicked" landowners to Elkhorn.[14]   McMartin also arranged for

Elkhorn to use McMartin's parents' buildings in exchange for custom work.  According to

McMartin, he left Elkhorn because "in the infancy of that company, they really didn't

know what they needed for either technical help—managerial or labor on the farm—and

it became apparent that the type of work that I'm good at, they did not need."

Neither Zak nor McMartin selected the equipment Elkhorn acquired; they were

not even involved in the selection process.  In fact, Brian Johnson advised Johnson that

"the less Ron has to do with it, the better."

## II.    CONCLUSIONS OF LAW

The Trustee seeks to avoid transfers from Debtor to Johnson totaling $740,882.50

under 11 U.S.C. § 547.  See Doc. 1.  To avoid Debtor's transfers to Johnson as

preferential under section 547(b), the Trustee must show that the transfers were:

(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such
    transfer was made;
(3) made while the debtor was insolvent;
(4) made—
    (A) on or within 90 days before the date of the filing of the petition;
        or
    (B)  between ninety days and one year before the date of the filing
         of the petition, if such creditor at the time of such transfer was
         an insider; and

---

[13] Rachel McMartin, one of McMartin's daughters, also worked for Elkhorn for a time.

[14] The Morrison Family Trust was among the landowners McMartin referred to Elkhorn.  See T-15, at 3.

13

(5) that enables such creditor to receive more than such creditor would
    receive if—
      (A) the case were a case under chapter 7 of this title;
      (B) the transfer had not been made; and
      (C) such creditor received payment of such debt to the extent
         provided by the provisions of this title.

11 U.S.C. § 547(b)(1)–(5).  The Trustee bears the burden of proving each of these

elements by a preponderance of the evidence.  Stingley v. AlliedSignal, Inc. (In re Libby

Int'l, Inc.), 247 B.R. 463, 466 (B.A.P. 8th Cir. 2000) (citations omitted).  If he establishes

these elements, the burden then shifts to the transferee to prove any affirmative

defenses available under section 547(c).  Id.

      Prior to trial, the parties stipulated that the Trustee established all the elements of

a preferential transfer except subsection 547(b)(4)(B):  the transfers from Debtor to

Johnson were made "between ninety days and one year before the date of the filing of

the petition, if such creditor at the time of such transfer was an insider."  Doc. 53.

Johnson disputes he is an insider.

      Rather than defining "insider," the Bankruptcy Code provides a nonexclusive list

of examples.  11 U.S.C. § 101(31).  Section 101(31) provides, in relevant part, that the

term "insider" includes:

(B)    if the debtor is a corporation—
    (i)    director of the debtor;
    (ii)   officer of the debtor;
    (iii)  person in control of the debtor;
    (iv)  partnership in which the debtor is a general partner;
    (v)   general partner of the debtor; or
    (vi)  relative of a general partner, director, officer, or person in
        control of the debtor;
                      * * *
(F)    managing agent of the debtor.

Id.  "For avoidance litigation in a bankruptcy case, the determination of insider status 'is a

mixed question of law and fact and not merely a question of fact.'" <u>In re Petters Co., Inc.</u>, 499 B.R. 342, 364 (Bankr. D. Minn. 2013); <u>Myers v. Blumenthal</u> (<u>In re M&M Mktg., L.L.C.</u>), 2013 WL 3071005, at *4 (Bankr. D. Neb. 2013).  The concept of an insider "encompasses any entity that had 'a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor.'" <u>In re Petters Co., Inc.</u>, 499 B.R. at 364-65 (citations omitted).

The Trustee alleges Johnson is an insider of Debtor because: 1) he is related to Zak, who was a managing agent of Debtor; 2) he is related to Zak, who was a person in control of Debtor; and 3) Johnson is a nonstatutory insider.[15]  The Court will address each of the Trustee's allegations.

### 1.   Managing Agent

The Trustee asserts that Johnson is a relative of Zak, who he claims was a managing agent of Debtor.  Doc. 58.  Section 547(b)(5) when read in conjunction with section 101(31)(B) does not permit the Trustee to avoid a transfer to <u>a relative of</u> a managing agent of Debtor.  Consequently, even if the evidence the Trustee offered shows that Zak was a managing agent, it does not establish that Johnson is an insider. At most, it would support a claim that Zak is an insider, which the Trustee did not allege. The Trustee did not allege that Johnson was a managing agent of Debtor, and he did not

---

[15] Initially, the Trustee argued that Johnson was a general partner of Debtor and that Johnson was an affiliate of Debtor. He did not pursue these arguments in Plaintiff's Trial Memorandum or at trial.  <u>Cf.</u> Docs. 29, 58.  Consequently, the Trustee abandoned them.  Even if the Trustee did not abandon them, the Court finds that the Trustee failed his burden of proving them.  For the reasons stated in this order and the Memorandum and Order denying summary judgment [Doc. 40], the Court finds that Johnson was not a partner or affiliate of Debtor.

offer evidence showing Johnson was a managing agent. For this reason, the Court

rejects the Trustee's assertion that Zak's alleged role as a managing agent satisfies his

burden of showing Johnson is an insider.

As discussed below, many of the Trustee's allegations underlying his assertion

that Zak was a managing agent of Debtor support his argument that Zak was a person in

control of Debtor. The Court will consider them in that context.

### 2.    Person in Control

Under section 101(31), the list of insiders for a debtor corporation includes a

"relative of a general partner, director, officer or person in control of the debtor." 11

U.S.C. § 101(31)(B)(vi). A "relative" is any "individual related by affinity or consanguinity

within the third degree as determined by the common law." 11 U.S.C. § 101(45).

Johnson does not dispute that Zak, who is Johnson's nephew, is his relative under the

statute. The issue is whether Zak was a "general partner, director, officer or person in

control" of Debtor. The Trustee does not allege that Zak was a general partner, director

or officer of Debtor; he argues that Zak was a "person in control" of Debtor.

Whether "'a person [is] in control of the debtor,' is fact-intensive." In re Petters

Co., Inc., 499 B.R. at 365. Courts determine the extent of such control on a case-by-

case basis. In re M&M Mktg., 2013 WL 3071005, at *4. "This sort of statutory insider

status turns on 'whether . . . the facts indicate an opportunity to self-deal or [to] exert

more control over the debtor's affairs than is available to other creditors.'" In re Petters

Co., Inc., 499 B.R. at 365 (citation omitted). The court in In re Petters explained:

> The defendant must have "actual control (or its close equivalent)." In
> re Winstar Commc'ns, Inc., 554 F.3d at 396. This actual control has been
> identified as "the ability of the [defendant] to 'unqualifiably dictate corporate
> policy and the disposition of corporate assets.'" In re U.S. Medical, Inc., 532

16

F.3d 1272, 1279 (10th Cir. 2008). A finding of actual control may be based upon the direction of "such things as the [d]ebtor's personnel or contract decisions, production schedules or accounts payable." In re ABC Elec. Servs. Inc., 190 B.R. at 675.

Id.

The Trustee claims "Zak was one of the few managers of Debtor with ability to influence a major part of Debtor's operation." Doc. 58 at 8. As evidence of Zak's purported control over Debtor, the Trustee argues that Zak managed the Grand Forks farm "with full responsibility for hiring, firing, work assignments and purchasing within that region." Id. He asserts that Zak was on Debtor's management team and oversaw a major portion of Debtor's operations.

The evidence belies many of the Trustee's assertions underlying his claim. Specifically, the evidence shows that Zak did not have unfettered authority to hire and fire employees. At most, Zak selected employees for fall harvest, whose employment was confirmed and finalized by the office staff. The rest of the year, his role in the hiring process included identifying, interviewing and testing prospective employees, and Debtor's office staff hired them. The Court received no evidence Zak ever fired any employee. Zak's personnel-related decisions—while significant—were supervisory in nature and do not demonstrate control over Debtor's affairs.

Further, Zak's role as a member of the management team was advisory in nature. Zak and the other team members made recommendations to the team, which in turn made recommendations to McMartin. McMartin ultimately determined Debtor's plan or strategy, and the team executed it. McMartin made all final decisions. Zak did not sell crops, and he did not have the authority to contract on behalf of Debtor. He was not involved in collecting payment for crops. Although he ensured that the crops were

17

accurately listed in crop insurance paperwork, he did not sign crop insurance forms.

As the Grand Forks farm manager, Zak controlled the daily operations of that particular farm.  But the evidence overwhelmingly demonstrates the considerable limits to Zak's control or influence over **Debtor**.  Debtor did not authorize Zak to issue checks on Debtor's behalf, and Zak did not have signatory authority on any of Debtor's accounts.  Although Debtor authorized Zak to order equipment repairs and buy parts, it limited his spending authority. He did not buy new equipment for Debtor.  Zak reviewed invoices, but he had no authority to pay them, sending them to Debtor's office for payment instead.  Zak did not dictate which bills Debtor paid or when Debtor paid them. He had no authority to spend Debtor's money on his personal expenses.

Likewise, Zak had no input on the price Debtor paid for land rent. He had no control over Debtor's finances or budget.  He did not sell or dispose of any of Debtor's assets.  Zak did not control Debtor's policies.  Zak's role was limited to directing his employees in executing Debtor's plan as determined by the management team's recommendations and McMartin's decisions.  Zak did not exercise actual control over Debtor as a whole.

For these reasons, the Court finds and concludes that Zak was not a "person in control" of Debtor under section 101(31)(B)(vi).  Accordingly, Johnson is not an insider by virtue of his familial relationship to Zak.

### 3.    Nonstatutory Insider

The list of insiders provided in section 101(31) is not exclusive.  11 U.S.C. § 102(3) ("'[I]ncludes' and 'including' are not limiting.").  The term "insider" also includes those who have "'a sufficiently close relationship to Debtor that its conduct is made

18

subject to closer scrutiny than those dealing at arm's length with the debtor.'"  <u>See e.g.</u>,

<u>Seaver v. Glasser</u> (<u>In re Top Hat 430, Inc.</u>), 568 B.R. 314, 318 (B.A.P. 8th Cir. 2017)

(quoting S. Rep. No. 95–989, 95th Cong., 2d Sess., <u>reprinted in</u> 1978 U.S.C.C.A.N.

5787, 5810 (quoted in <u>Carlson v. Farmers Home Admin.</u> (<u>In re Newcomb</u>), 744 F.2d 621,

624 n.4 (8th Cir. 1984))); <u>Stalnaker v. Gratton</u> (<u>In re Rosen Auto Leasing, Inc.</u>), 346 B.R.

798, 804 (B.A.P. 8th Cir. 2006) (citations omitted); <u>Eide v. Nat'l City Capital Corp.</u> (<u>In re

Riversideworld, Inc.</u>), 366 B.R. 34, 43 (Bankr. N.D. Iowa 2007) (citation omitted).  The

extent to which Johnson was in a position to control or influence Debtor is a relevant

inquiry in this analysis.  <u>See</u> <u>In re Riversideworld, Inc.</u>, 366 B.R. at 43; <u>Meeks v. Rison</u>

(<u>In re Armstrong</u>), 231 B.R. 746, 749 (Bankr. E.D. Ark. 1999) (citations omitted).  The

"closeness of the relationship between the parties" is also relevant to whether the

creditor is an insider.  <u>In re Rosen Auto Leasing, Inc.</u>, 346 B.R. at 804.

      In <u>In re Top Hat 430, Inc.</u>, the Bankruptcy Appellate Panel observed that courts

apply a variety of tests in their efforts to decide whether a party is a nonstatutory insider:

>     As some other courts have done . . ., the Bankruptcy Court here
> applied essentially a three-part test considering: (1) the closeness between
> Ms. Glasser and the Debtor; (2) the degree of control or influence Ms.
> Glasser had over the Debtor; and (3) whether the transactions between
> them were conducted at arm's length. Despite the various tests coming from
> courts attempting to deal with endless variations of possible insiders, "[i]t is
> important not to allow judicial glosses. . . to supersede the statute itself."
> Based on the statutory language and legislative history, the ultimate issue
> is whether the creditor has a sufficiently close relationship to management
> to presume that that creditor unfairly received special treatment.

568 B.R. at 319 (footnotes omitted); <u>see also</u> <u>Kaler v. Slominski</u> (<u>In re Keeley &

Grabanski Land P'ship</u>), 2012 WL 764442, at *17 (Bankr. D.N.D. Mar. 7, 2012) (applying

a two-factor test in determining whether a person is a non-statutory insider: "(1) the

**closeness of the relationship** between Debtor and the transferee, and (2) **whether the**

**transactions** between the transferee and Debtor were conducted at **arm's length.**"
(citation omitted)). "The determination of whether a person is a non-statutory insider is
fact-intensive, and must be made on a case-by-case basis." In re Top Hat 430, Inc., 568
B.R. at 318; see also In re Keeley & Grabanski Land P'ship, 2012 WL 764442, at *17; In
re Petters Co. Inc., 499 B.R. at 365.

The Trustee alleges Johnson is a nonstatutory insider because: (1) Johnson had
crop-sharing agreements, leases and crop-sharing partnerships with Debtor which
demonstrate a "closely intertwined relationship," (2) Johnson's office manager had direct
access to Debtor's accounting staff, (3) Zak was interviewed and hired because of
Johnson's referral and was a significant part of Debtor's operations, (4) Debtor paid
Johnson when other creditors were not paid, (5) in a prepetition email to Kinetic Leasing,
McMartin claimed Johnson was his partner and the emails show McMartin was "trying to
move [Debtor's] equipment to Johnson," (6) Johnson created Elkhorn "to carry on
Debtor's business," (7) Elkhorn hired McMartin and Rachel McMartin and used
McMartin's and Zak's knowledge to "capture most of [Debtor's] business," (8) Elkhorn
leased Ronald McMartin, Sr.'s buildings and farmed his land in 2017, (9) the "lease and
crop sharing agreements [between Debtor and Johnson] appear to be oral in nature,"
and (10) McMartin arranged for Debtor's lease with Morrison Family Trust to be
transferred to Elkhorn. Doc. 58. The Court is not convinced that the evidence the Court
received establishes that Johnson is a nonstatutory insider.

First, the Court rejects the assertion that Johnson's lease agreements with
Debtor demonstrate a closely intertwined relationship. Gauthier testified that Johnson's
relationship with Debtor was the same as Debtor's relationship with all other

20

landowners.  Gauthier never saw Johnson in Debtor's office.  McMartin and Johnson

rarely spoke, and when they spoke, their conversations were brief and related only to

their land lease agreements.  According to McMartin, he did not see or speak to

Johnson in 2016, the year Debtor transferred the lease payments at issue.  McMartin

and Johnson both testified that Debtor paid Johnson market price for leasing

Johnson's land.  The Court received no evidence to the contrary.  Although Johnson's

office manager had direct access to Gauthier, Gauthier testified that she rarely

communicated with Johnson's office manager.  There is no evidence that the two had a

close relationship or that the transactions between Debtor and Johnson were not at

arm's length because of their relationship.  Based on the evidence received at trial, the

Court finds that the lease transactions between Debtor and Johnson were negotiated at

arm's length.[16]

The Court also rejects the Trustee's suggestion that Johnson influenced Debtor's

decision to hire Zak.  Johnson told Zak that Debtor would be farming some of Johnson's

land, and Zak contacted McMartin to inquire about a position with Debtor.  McMartin was

familiar with Zak because both Debtor and Zak farmed Johnson's land.  Johnson did not

contact McMartin about hiring Zak.  There was no evidence that Debtor hired Zak

**because** Johnson referred him.

---

[16] The Trustee alleges the lease and crop sharing agreements between Debtor
and Johnson were oral, and that this shows Debtor and Johnson were not dealing at
arm's length. First, all Debtor's leases with Johnson were in writing.  Johnson and Debtor
reached an oral agreement as a modification to one of their written leases due to
flooding.  The Court finds the explanation for the oral modification credible, and it is not
convinced that it demonstrates a close relationship or unfair dealing.

21

Likewise, the Court is not convinced that McMartin's email to Kinetic Leasing establishes the Trustee's claim. In early February 2017, McMartin sent an email to Kinetic Leasing claiming that Johnson was his new farm partner. McMartin explained at trial that he was pondering a partnership with Johnson at the time but had not discussed—and never discussed—the possibility with Johnson. McMartin conceded he was trying to keep the creditor "holding on" while McMartin scrambled to try to keep his business afloat. Johnson testified that he never intended to partner with Debtor. In short, McMartin misrepresented the closeness of his relationship with Johnson to a third-party creditor, but that misrepresentation did change the character or nature of the relationship.

The Trustee also failed to show that Johnson created Elkhorn "to carry on Debtor's business." Rather, Johnson and his cousin formed Elkhorn to farm Johnson's land, on short notice, because Debtor would not be farming the land it had leased. McMartin testified that no one knew about Debtor's bankruptcy until it filed the petition. By early 2017, Johnson heard rumors about Debtor's financial troubles, but McMartin did not speak directly to Johnson about Debtor's financial distress.

After Debtor petitioned for bankruptcy relief, Elkhorn hired Rachel McMartin and McMartin for a short time. The parties did not flesh out the details of Rachel McMartin's employment with Elkhorn, and the Court declines to draw inferences about her employment without any evidentiary support. As for Elkhorn's decision to hire McMartin, Johnson was not an experienced farmer. Elkhorn hired McMartin to help with the logistics of farming, a field in which McMartin was unquestionably experienced. This employment did not last long. At some point after Debtor petitioned for bankruptcy and

22

before McMartin stopped working for Elkhorn, McMartin referred other landowners with whom Debtor had contracted prebankruptcy to Elkhorn, including the Morrison Family Trust.  Elkhorn also leased Ronald McMartin, Sr.'s buildings and farmed his land in 2017.

In considering the totality of circumstances, it is apparent that Ekhorn benefited from McMartin's referrals and expertise for a short time, and McMartin benefited from employment for a short time.  The Court is not convinced, however, that the Trustee established that Debtor and Johnson had a close relationship that resulted in Johnson unfairly receiving special treatment from Debtor before it petitioned for bankruptcy relief. The evidence does not show that Johnson received special deals from McMartin's referrals; it does not establish that McMartin and/or Debtor were partners with Johnson; it does not show that Johnson created Elkhorn Farms with the advice and consent of McMartin; it does not establish that Johnson created Elkhorn to "carry on Debtor's business;" and it certainly does not show that Johnson controlled Debtor.[17]  The evidence shows that Johnson created Elkhorn to mitigate against a potential loss resulting from Debtor's land lease breaches, and that all transactions between Debtor and Johnson were negotiated at arm's length.

Finally, the Court is not persuaded that Johnson is a nonstatutory insider because Debtor paid land rent to Johnson at a time when Debtor was not paying some of its other creditors.  Gauthier explained that Debtor prioritized payments to local suppliers and landowners when Debtor began experiencing cash flow problems. She further testified

---

[17] Likewise, the evidence shows that Johnson was not a shareholder or director of Debtor.  He did not control Debtor's corporate policies.  Johnson did not have access to Debtor's financial information, and he did not have authority to pay Debtor's obligations or to contract on Debtor's behalf.

23

that Debtor did not prioritize payments to Johnson over any other landowner.  While

Debtor's decision to pay Johnson at a time when it was not paying other creditors gives

the Court pause, this conduct, without more, does not show that the payments to

Johnson demonstrate a close relationship resulting in Johnson unfairly receiving special

treatment.

In summary, the Court finds and concludes that the Trustee did not show that

Johnson controlled or influenced Debtor, that Johnson had a close relationship with

Debtor, or that the transactions between Johnson and Debtor were not conducted at

arm's length.  Accordingly, the Trustee did not meet his burden of establishing that

Johnson was a nonstatutory insider by a preponderance of the evidence, and his

preferential transfer cause of action under section 547(b) fails.

## III.    CONCLUSION

The Court has considered all other arguments and deems them to be without

merit or unnecessary to discuss.

For the reasons stated above, the Court finds in favor of Defendant Kenneth H.

Johnson and against Plaintiff Erik A. Ahlgren.  Plaintiff's claims and causes of action are

dismissed with prejudice.

Dated: October 13, 2020.

Shon Hastings

SHON HASTINGS, JUDGE
UNITED STATES BANKRUPTCY COURT

24